UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

**Case No. 17 CV 4799 (JGK)**

AITABDELLAH SALEM

**SECOND**
**AMENDED COMPLAINT**

                    **Plaintiff,**

CITY OF NEW YORK, JOSEPH PONTE, COMMISSIONER
OF THE NEW YORK CITY DEPARTMENT OF CORRECTION,
IN HIS INDIVIDUAL CAPACITY, JOHN DOE NO.1, WARDEN,
NEW YORK CITY DEPARTMENT OF CORRECTION, IN HIS
INDIVIDUAL CAPACITY, JOHN DOE NO. 2, ASSISTANT WARDEN,
OF THE NEW YORK CITY DEPARTMENT OF CORRECTION,
IN HIS INDIVIDUAL CAPACITY, JOHN DOE NO.3, TOUR COMMANDER
NEW YORK CITY DEPARTMENT OF CORRECTION, AMKC, RIKERS ISLAND,
IN HIS INDIVIDUAL CAPACITY, AND JOHN DOE NO. 4, CAPTAIN,
NEW YORK CITY DEPARTMENT OF CORRECTION, AMKC,
RIKERS ISLAND, IN HIS INDIVIDUAL CAPACITY.

                    Defendants,
_____X

  Plaintiff Aitabdellah Salem ("Salem"), by and through his attorney, Welton K. Wisham, of

the Law Office of Welton K. Wisham, alleges upon information and belief as follows:

**INTRODUCTION**

  1. Defendants City of New York and the New York City Department of Correction (the

"Department of Correction" or "DOC") have engaged in an unlawful pattern and practice of

holding pretrial detainees in custody on bail in the amount of $ 1.  The Defendants, Joseph Ponte,

Commissioner of the Department of Correction and the other Supervisory Defendants, Tour

Commanders, Wardens, Assistant Wardens, as official policy makers, have instituted and

participated in a custom and practice of willfully and deliberately failing to inform pretrial

detainees that their bail status had changed to the amount of $ 1.00.  The custom is so common

and well settled as to constitute a custom that fairly represents municipal policy of the New York City Department of Correction.

2. The failure to inform pretrial detainees of the change in their bail status to one dollar, an amount which the detainees were capable of paying had they been informed and the continued incarceration of such detainees on $ 1 bail, serves no legitimate purpose or goal of the New York City Department of Correction, and as such is a policy in contravention of the Due Process Clause to the Fourteenth Amendment to the Constitution of the United States.

3. The public officials, Joseph Ponte, the Tour Commanders, Wardens, Deputy Wardens, and Captains, each had knowledge of the inmates bail status and each Defendant official acted with deliberate indifference to the inmate's Constitutional right to be free from incarceration without Due Process of Law.

4. Mr. Salem was incarcerated for one hundred thirty eight (138) days without being informed by the individual DOC Defendants that his bail had been reduced to $1. Eighty four of those were after a criminal court judge ordered the Commission of the DOC and the Warden of the Anna M. Kross facility in Rikers Island to produce Salem in civilian clothes for his anticipated release from custody on January 21, 2015.  The Doc willfully and purposefully ignored the court order, and produced Salem in prison clothes on January 21, 2015, not inside the court room but left in the court's holding cell after which he was sent back to Rikers Island where he remained until April 15, 2015, upon which one dollar bail was paid.

5. The policy implemented by Commissioner Ponte and the AMKC Tour Commanders, Wardens and Captains of holding inmates on $1 bail, and not informing pretrial detainees that the status of their bail had been reduced to $ 1, caused Salem to held for one hundred thirty eight days in violation his Fourteenth Amendment right to be free from incarceration without due

process of law.  The policy implemented by the Defendants served no other purpose that to inflict punishment on the detainees, which is strictly forbidden under the Constitution.

6.  Mr. Salem repeatedly asked his jailers everyday what happened in court with his case because Salem was not produced in court on several occasions from November 26, 2014, through his release on April 15, 2015. Salem had no idea that his bail originally set on November 22, 2014, in the amount of $ 50,000, had been reduced to $1 on November 28, 2014, an amount that he was capable of paying.

7.  The Defendants held Mr. Salem incommunicado for a period of one hundred thirty eight days based on a policy of the DOC of not informing him and other pretrial detainees that their initial bail had been reduced to $1.

8.  The municipal policy and practice is unreasonable and is not related to a legitimate goal of the DOC.

9.  The municipal policy and practice caused the deprivation of several hundred pretrial detainees of their liberty interest in violation of the Due Process Clause to the Fourteenth Amendment to the Constitution of the United States.

10.  Court orders from the New York City Criminal Court were sent to the DOC and should have been logged in the DOC's computer system as required in the General Office Manual training guide prepared by the New York City Department of Correction.

11. The municipal Defendants had knowledge that Salem should have been released on November 28, 2014, by paying one dollar bail, yet the Defendants willfully ignored the court orders to release Salem with deliberate indifference to his constitutional rights.

12.  The New York City Department of Correction has a policy and practice of knowingly and willfully refusing to timely release pretrial detainees from incarceration upon court orders

3

requiring the immediate release of pretrial detainees.  The Defendants acted with deliberate indifference to the constitutional injury that the implementation and execution of the policy and practice describe herein caused hundreds of pretrial detainees to suffer.

13.   The Defendants' deliberate indifference to these constitutional rights caused Mr. Salem serious psychological and emotional harm.

14.   In addition, the New York City Department of Correction engaged in the practice of hiring and retaining unqualified correction officers who were assigned to work in the records department inside the General Office at Rikers Island, AMKC during calendar year 2014 through April 15, 2015, without the knowledge and training and supervision required to implement the release procedures found in the General Office Manual promulgated by the DOC.

15.   The correction officers within the DOC lacked sufficient training and supervision in processing court orders to release Salem.  The court orders were directed to the Commissioner of the Department of Correction, Joseph Ponte and the Warden at the Anna M. Kross Center where Mr. Salem was held from November 22, 2014, through April 15, 2015.

16.   Moreover, the Department of Correction failed to properly train or supervise employees within the DOC at Rikers Island in (1) Processing Court Orders directed to the Commissioner of the DOC and the Warden at the AMKC detention facility that changed the status of pretrial detainee's bail, (2), Processing Court Orders demanding the production of pretrial detainees to appear in court, (3) Processing Criminal Court Orders received by the DOC ordering the Commissioner and the Warden in Discharging pretrial detainees, (4) Processing Court Orders changing Pretrial detainees' detention status at AMKC facility at Rikers Island.

17.   The failure of the New York City Department of Correction to monitor, oversee, and supervise staff members within the General Office at the AMKC facility relating to the

4

processing of court orders to produce, orders to release, orders in changing bail status of pertain detainees, was the moving force that was responsible for the Constitutional injury suffered by Plaintiff Salem, unlawful and prolonged incarceration for one hundred thirty eight days.

18.   The allegations by the Plaintiff in the instant matter present claims on the constitutionality of the conditions and restrictions of pretrial detention that implicate the protection against the deprivation of liberty without due process of law and whether those conditions amount to punishment.

19.   "Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention… A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Thus if a **particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to <u>punishment.</u> Conversely, if a restriction or condition is not reasonable related to a legitimate goal- if it is arbitrary or purposeless-** a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." **<u>Bell v. Wolfish</u>**,   441 U.S 520, (1979) at 535, 537, 538-39. (Emphasis)

20.   This is a civil rights action in which Plaintiff Aitabdellah Salem seeks relief for Defendants' violation of his rights secured by the Civil Rights Act of 1871, 42. U. S. Code Section 1983 and rights arising under the Fourth, and Fourteenth Amendments to the Constitution of the United States.

21.   Mr. Salem seeks compensatory and punitive damages, and an award of costs, and attorney fees, and such other and further relief as this Court deems equitable against the City of New

York and the Commissioner of the New York City Department of Correction, the Wardens, Assistant Wardens, Assistant Wardens, Tour Commanders, Captains and other unidentified correction officials due to their willful failure to comply with court orders to release the Plaintiff from incarceration at Rikers Island.

## JURISDICTIONAL STATEMENTS

22.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. Sections 1331, 1343, and 28 U.S.C. Section 1367, and under 42 U.S.C Section 1983, and 28 U.S.C. Section 1988.

23.  This action arises under the Fourth and Fourteenth Amendments to the Constitution of the United States.

## VENUE

24.  Under 28 U.S.C. Sec. 1391(b), venue is proper in the Southern District of New York because the Defendants are located in this District.

25.  Venue is proper in the Southern District of New York because the Defendants are all residents of the State of New York.

## PARTIES

26.  Plaintiff Aitabdellah Salem is a resident of the United States and at all times relevant herein was a resident of the State of New York, County of Kings. Plaintiff Salem resided at Rikers Island at the time these events occurred.

27.  The Defendant, City of New York is at all times relevant herein a municipal entity created and authorized under the laws of the State of New York.

28.  The City of New York is authorized by law to maintain a Department of Correction, the employees of which act as its employees and agents, for which the City of New York is ultimately responsible.

29.  The City of New York assumes the risks incidental to the maintenance of The New York City Department of Correction and the employment of correction officers and other Department of Correction employees.

30.  The City of New York, through the New York City Department of Correction ("DOC") manages, and operates the jails including the Anna M. Kross Center ("AMKC") where the Plaintiff, Aitabdellah Salem was unlawfully incarcerated from November 28th, 2014, through April 15th, 2015.

31.  The vast majority of the population on Rikers Island consists mainly of pre- trial detainees, most of whom, like the Plaintiff, are indigent and cannot afford to pay for legal representation.

32.  The City of New York, though the New York City Department of Correction is also responsible for operating sixteen Court facilities.  The Court "pens" are located in the Criminal, Supreme and Family Court buildings in each borough.

33.  The Courthouse facilities hold inmates scheduled for the day's judicial proceedings.

34.  The City of New York, through The New York City Department of Correction, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to complying with Court orders to produce inmates in Court and Court orders to release pretrial detainees upon Court order.

35.  The DOC, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the production of inmates to their schedule court appearances and policies and practices with regards to training and supervision of its employees within the DOC in processing court orders directing the DOC to release inmates from incarceration.

36.  Senior officials in the New York City Department of Correction are aware of, and tolerate, practices by subordinate employees in the jails of holding pretrial detainees in custody on bail in the amount of one dollar.  The policy and practice is inconsistent with and not rationally related to any legitimate goal of the DOC in detaining pretrial detainees.  This practice, because it is widespread, long-standing, and deeply embedded in the culture of the DOC, constitute unwritten DOC policy.

37.  The Department of Correction is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.

38.  The City of New York, and the New York City Department of Corrections are jointly responsible for the safety, care, custody, and control of the inmates and others incarcerated on Rikers Island.

**JOSEPH PONTE: COMMISSIONER**

39.  At all times relevant hereto, Defendant Joseph Ponte was the Commissioner of the New York City Department of Correction acting in the capacity of agent, servant, and employee of Defendant City of New York, within the scope of his employment as such, and acting under color of state law.

40.  Upon information and belief, Commissioner Ponte, as Commissioner of the Department of Correction was responsible for the policies, practices, supervision, implementation, and conduct of all DOC matters, and was responsible for the training, supervision, retention, discipline and conduct of all DOC personnel, including the municipal Defendants referenced herein.

41.  As Commissioner, Ponte was also responsible for the care, custody, and control of Plaintiff Salem housed in the AMKC jail at Rikers Island from November 28th, 2014, through April 15th, 2015.

42.  In addition, at all relevant times, Ponte was responsible for enforcing the rules of the New York City Department of Correction and for ensuring that Department's personnel obeyed the laws of the United States and of the State of New York.

43. As Commissioner, Ponte was also responsible for the care, custody, and control of all inmates housed in the Department's jails. In addition, at all relevant times, Ponte was responsible for enforcing the rules of DOC, and for ensuring that DOC personnel obeyed the laws of the United States and of the State of New York.

**Warden**

44.  At all times relevant hereto, Defendant John Doe No.1, upon information and belief, was the Warden at the New York City Department of Correction responsible for the oversight of the Anna M. Kross Center ("AMKC") at Rikers Island from November 22nd, 2014, through April 15th, 2015.

45.  At all times relevant hereto John Doe No. 1 acting as Warden of the AMKC, whose name by which Plaintiff has currently been unable to ascertain notwithstanding reasonable efforts to do so by way of a Freedom of Information request (FOIL), but who is sued herein by the fictitious designation "John Doe No. 1, was a Warden acting in the capacity of agent, servant, and employee of the Defendant City of New York and the New York City Department of Correction within the scope of his employment, as such and acting under color of state law.

46. Upon information and belief, the Warden at the Anna M. Kross Center jail in Rikers Island, is ultimately responsible for the proper administration of the facility including but not limited to processing Court Orders to release pretrial detainees and producing detainees held at the Anna M. Kross facility to their court ordered appearances.

47. Upon information and belief, the Warden is responsible for all policies and practices instituted by the New York City Department of Correction including but not limited to 1) producing inmates to their Court ordered appearances and 2) ensuring compliance with Court Orders directing the release of inmates from incarceration.

48. The Warden, upon information and belief encompasses both managerial and non-managerial assignments.

49. The Warden is responsible for administrative and supervisory correctional work of varying degrees of difficulty and with varying degrees of latitude for independent initiative and judgment.

50. Wardens assist in the administration of a large correctional facility or command by serving as Tour Commander and/or Commanding Officer of an assigned Department of Correction field command.

51. The Warden of a facility serves as the Executive Officer of such facility or command.

52. Wardens serve as a Training Officer at the Correction Academy and serve in a command function over such activities at a central office unit or Transportation Division and perform related work.

53. The Warden at the AMKC facility serves as one of the highest-ranking uniformed member of the DOC, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in AMKC. The Warden is responsible for the custody and care of all inmates.

**<u>Assistant Warden</u>**

54. At all times relevant hereto, Defendant John Doe No.2, upon information and belief, was the Assistant Warden at the New York City Department of Correction who was also responsible

for the oversight of the Anna M. Kross Center ("AMKC") at Rikers Island from November 22nd, 2014, through April 15th, 2015.

55.  At all-times relevant hereto, John Doe No. 2, acting as the Assistant Warden of the AMKC whose name by which Plaintiff is currently been unable to ascertain, notwithstanding reasonable efforts to do so by way of a Freedom of Information request (FOIL), but who is sued herein by the fictitious designation "John Doe No. 2, was an Assistant Warden acting in the capacity of agent, servant, and employee of the Defendant City of New York and the New York City Department of Correction within the scope of his employment as such and acting under color of state law.

56.  Upon information and belief, the assistant Warden has the responsibility for ensuring that the directives initiated by the New York City Department of Correction are complied with regarding:  1) Producing inmates to their Court ordered appearances and, 2) Complying with Court Orders releasing inmates from incarceration.

**Tour Commander**

57.  At all-times relevant hereto, Defendant John Doe No. 3, upon information and belief, was the Tour Commander at the New York City Department of Correction responsible for the oversight of the Anna M. Kross Center ("AMKC") at Rikers Island from November 22nd, 2014, through April 15th, 2015.

58.  At all-times relevant hereto, John Doe No. 3 acting as the Tour Commander of the AMKC, whose name by which Plaintiff is currently been unable to ascertain notwithstanding reasonable efforts to do so by way of a Freedom of Information request (FOIL), but who is sued herein by the fictitious designation "John Doe No. 3, was the Tour Commander at the Anna M. Kross Center at Rikers Island acting in the capacity of agent, servant, and employee of the Defendant

City of New York and the New York City Department of Correction within the scope of his employment, as such and acting under color of state law.

59. Upon information and belief, it is the Tour Commander who is responsible for the supervision of the Captains working in the AMKC and are responsible for ensuring that the policies and practices relating to the processing of inmates for discharge, and the processing of Court Orders releasing inmates from incarceration and the Production of Inmates to their Court ordered appearances, are fully in compliance with the directives set forth by the City of New York Department of Correction.

**Captain**

60. At all-times relevant hereto, Defendant John Doe No. 4, upon information and belief was one of Captains at the New York City Department of Correction responsible for the oversight of the Anna M. Kross Center ("AMKC") at Rikers Island from November 22nd, 2014, through April 15th, 2015.

61. At all-time relevant hereto John Doe No. 4, acting as the Captain of the AMKC whose name by which Plaintiff is currently unable to ascertain, notwithstanding reasonable efforts to do so by way of a Freedom of Information request (FOIL), but who is sued herein by the fictitious designation "John Doe No. 4, was a supervising officer at the Anna M. Kross Center at Rikers Island acting in the capacity of agent, servant, and employee of the Defendant City of New York and the New York City Department of Correction within the scope of his employment, as such and acting under color of state law.

62. At all times relevant hereto, Defendant John Doe No. 4 whose first and last names and shield number Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe No. 4," was a supervising officer

within the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.

63.  Upon information and belief, Defendant John Doe No. 4 worked at AMKC on Rikers Island from November 22, 2014, through April 15, 2015.

64.  Upon information and belief, Defendant John Doe No. 4, Captain, was employed by the New York City Department of Correction at the Anna M. Kross Center at Rikers Island jail from November 22nd, 2014, through April 15th, 2015.

65.  Upon information and belief, the Captain was ultimately responsible for verifying Mr. Salem's Court ordered discharged on November 28th, 2014, and verifying that the Court had reduced Mr. Salem's bail from $25,000.00 to $1.00 on November 26th, 2014.

66.  Upon information and belief John Doe No. 4, as Captain of the Anna M. Kross Center was aware, or should have been aware of the facts set forth herein, that the Court had reduced Mr. Salem's bail to $1.00 on November 26th, 2014, and that the Court ordered Mr. Salem released from incarceration on November 28th, 2014.

67.  That Defendant John Doe No. 4, as Captain of the Anna M. Kross Center during Plaintiff's incarnation November 22nd, 2014, through April 15th, 2015, was deliberately indifferent to Plaintiff's Constitutional rights under the Constitution of the United States forbidding Salem's deprivation of liberty without due process of law.

68.  The City and the Supervisory Defendants cannot dispute the fact that they are unaware of the policy, practice or custom for failing to inform pretrial detainees that their initial bail has been reduced to one dollar, an amount that the detainees surely were capable of paying.

69.  The City of New York and the Municipal Defendants cannot dispute the fact that they were made aware of the fact that the City of New York was found to have had a widespread policy

and practice of hiring correction officer unfit for their respective duties and the fact that such officers lacked adequate training and supervision which caused the deprivation of rights guaranteed under the Constitution to the United States.

## STATEMENT OF FACTS

### Court Orders to Release Salem from Incarceration

70.  Plaintiff was arrested on November 21st, 2014, for stealing a coat from Zara clothing store located on 101, 5th Avenue, New York, New York.

71.  Mr. Salem was arraigned on November 22nd, 2014, where he was charged with Assault in the Second Degree per Penal Law Section 120.05(3), and Petit Larceny, per Penal Law Section 155.25 under docket number   2014NY088542.

72.  Plaintiff was remanded to Rikers Island and held at the Anna M. Kross Center ("AMKC") at Rikers Island on November 22nd, 2014.

73.  On November 22nd, 2014, Mr. Salem was arraigned in the Criminal Court City of New York, by the Honorable Neill Ross, Acting Supreme Court Justice on the charges stemming from his November 21st, 2014, arrest. The docket number assigned to that case was 2014NY088542.

74.  Mr. Salem was represented by Stephen Pokart of The Legal Aid Society.

75.  Mr. Salem had two other companion cases pending which were called before the Court on November 22nd, 2014.  The docket numbers pertaining to those cases were 2014NY088543, and 2014NY017648. Bail in the total amount of $50,000 was set, $25,000 on docket numbers 2014NY088543, and 2014BX088542, respectively.

76. Mr. Salem was sentenced to time served under docket number 2014NY017648.

77.  Judge Ross adjourned both cases under docket numbers 2014NY088542, and 2014 NY088543, to November 26th, 2014, in Part F of the Criminal Court.

**Court Orders to Release Salem from Incarceration**

78. On November 26th, 2014, the Honorable Gilbert Hong presided over docket numbers 2014NY088542 and 2014NY088543.  Mr. Salem was not produced in court.

79. Judge Hong reduced Salem's $25,000.00 bail under docket number 2014NY088542, to $1.00.  Salem's case under docket number 2014NY088542 was adjourned to February 11th, 2015, in Part F.    The charges under number **2014NY088543** were adjourned to **Part F, November 28th, 2014,** for grand jury action in accordance with New York Criminal Procedure Law Section 180.80. The same bail condition in the amount of $25,000.00 was ordered by Judge Hong.

80. Plaintiff **was not produced in Court** on November 26th, 2014, and was not aware that Judge Hong had reduced his bail from $25,000.00 to $ 1.00 under docket number **2014NY088542.**  Salem's criminal defense attorneys did not inform him of the reduction in bail nor did the Defendant employees of the Department of Correction.

81. On November 28th, 2014, the Honorable Justice Melissa Crane presided over the proceeding under docket number **2014NY088543**.  Again, **Mr. Salem was not produced in Court** – his appearance was waived by his criminal defense attorney.

82. Judge Crane **ordered the immediate release** of Mr. Salem in accordance with Criminal Procedure Law Section 180.80 which requires the Defendant's release from incarceration in the event the grand jury has not convened within one hundred forty four hours. (Emphasis added). Plaintiff was ordered release on his own recognizance (ROR)

83. The District Attorney's office failed to convene the grand jury within the prescribed time and thus, Mr. Salem was ordered released on his own recognizance by Judge Crane on November 28th, 2014.

15

84.  Judge Crane asked Mr. Frantel, the assistant district attorney representing the State Of New York, "People, you are conceding 180.80?  Mr. Frantel responded, "Yes, your honor." Judge Crane then asked Mr. Frantel, "and therefore, you are **consenting to release as well, right?" Mr. Frantel responded" Yes, your honor**".

85.  Mr. Salem's case arising under Docket number Docket number 2014NY088543 was adjourned to February 11th, 2015, in Criminal Court, Part F.

86.  That as of November 28, 2014, there were no other holds, or warrants against Mr. Salem that would have prevented him from being released after his November 28, 2014, court proceeding.

87.  On November 28, 2014, the honorable Judge Mellisa Crane issued and order which was directed to the attention of The Commissioner of Correction of the City of New York which ordered then Commissioner Joseph Ponte to immediately release Mr. Aitabdellah Salem from custody in connection with docket number 2014NY088543. **Exhibit"A".**

88.   Judge Crane ordered the Commissioner of Correction of the City of New York to "perform all required procedures to affect the defendant's IMMEDIATE RELEASE in connection with this matter.  You are further directed to advise the defendant that he must appear in Part F of the Criminal Court, County of NY on 2/11/15 to answer the charges contained in the above mentioned Docket". (Emphasis by Judge Crane)  **Exhibit "A".**

89.  Judge Crane's order to release Mr. Salem was received by the Department of Correction on November 28, 2014, at 16:24 pm.  The acknowledgement of receipt of Judge Crane's order was made by S. Mra badge No. 382 of the New York City Department of Correction.

90. The Defendants cannot dispute the fact that Judge Crane ordered the Commission of Department of Correction to release Mr. Salem.  Nor can the Defendants dispute the fact that the DOC received the order on November 28, 2014.

91.  Mr. Salem was not released on November 28, 2014, as ordered by Judge Crane.

92.  Mr. Salem was not informed by The New York City Department of Correction of his next court date as ordered by Judge Crane.

93.  Salem was not released from custody until April 15, 2015.

94. The Defendants knowingly, and willfully, ignored Judge Crane's order to release Salem from incarceration on November 28, 214.

95. The Defendants' inactions were made with deliberate indifference to the constitutional injury to Mr. Salem.

96. Mr. Salem remained in the custody of the New York City Department of Correction in Rikers Island, **unaware that bail in the amount of $ 1.00 would free him from custody**.

97. The Defendants, City of New York, the New York City Department of Correction, Commissioner Ponte, the Wardens, Tour Commanders, Deputy Wardens, Captains and the Department of Correction employees were all aware of, or should have been aware of the fact that Judge Crane ordered the DOC to effect Mr. Salem's immediate release from incarceration.

98.  There was no legitimate reason for holding Salem on one dollar bail.

99. That on January 15, 2015, the Hon. Justice Mennin issued a Court Order, ordering the Warden at the Anna M. Kross correctional facility at Rikers Island to "[d]eliver the said defendant in **CIVILIAN CLOTHES** into the custody of the Commissioner of Correction of the City of New York, and it is further, **Ordered that the Commissioner of Correction receive the**

17

**said defendant from the said Warden and produce in Part F, on January 21, 2015, at 9:a.m.**

of that day at the Courthouse located at 100 Centre Street." See **Exhibit "B".** (emphasis added)

100. That it is undeniable that the Court Order to Produce by Judge Felicia A. Mennin **was received by the New York City Department of Correction. The Order was marked "Satisfied"** on 1-21-15, by D.O.C. officers Dfuco (emphasis) **The AMKC facility at Rikers Island received the Court and acknowledged receipt of on the Order.** See **Exhibit "B"**.

101.  Plaintiff, however, was **not produce** in Criminal Court on January 21, 2015, in Court in civilian clothes as ordered by Judge Mennin.

102.  Mr. Salem was brought to the holding been by the Department of Correction still dressed in his prison issued uniform.

103.  The New York City Department of Correction knowingly and willfully with the specific intent to deprived Salem of his freedom, ignored Judge Mennin's order to produce Salem in civilian clothes for the purpose of being released from custody on January 21, 2015.

104.  In further defiance of the court order to release Salem, the DOC signed Judge Mennin's January 15, 2015, order "Order Satisfied".

105.  The order was signed by D. Fugo of the Department of Correction on January 21, 2015.

106. The Warden, Tour Commanders, and Captains at the Anna M. Kross facility at Rikers Island all had received notice of the court orders to release Salem and knowingly and willfully participated in the DOC' plan to continue the unlawful incarceration of Aitabdellah Salem without legal justification and with deliberate indifference to Salem's constitutional right not to be deprived of his liberty without due process of law.

107. On January 21, 2015, the honorable Melissa Crane presided over docket number 2014NY088543.

108.   Salem was not produced in court.

109.   Judge Crane set bail on docket number 2014NY088543 in the amount of $1. (Salem had previously been released on his own recognizance under this docket number on November 28, 2014. by this same Judge Melissa Crane)

110.   Salem was not produced in his civilian clothes on January 21, 2015, as ordered by Judge Mennin on January 15, 2015.   Salem was not released from as anticipated in accordance with Judge Mennin's order.   Plaintiff was sent back to Rikers Island on January 21, 2015, still unaware that the restriction and condition of his confinement was predicated on paying one dollar bail on November 28, 2014, and the he was ordered released from custody on January 21, 2015 per Judge Mennin's order.

111.   Plaintiff was returned to criminal court on February 11, 2015. The Defendants continued their defiance of the Court orders still in effect to release Mr. Salem. Salem was again left standing in the Court's holding cell in his prison uniform and was returned to Rikers Island.

112.   Mr. Salem kept asking the correction officers and the Warden's he observed while held at the Anna M. Kross center" what's happening with my case, what's happening with my case?"

113.    The correction officers, Wardens and other supervisors at Anna M. Kross ignored Mr. Salem and refused to even acknowledge his concerns.

114.   That on February 11th, 2015, the Honorable Lisa Sokoloff, Judge of the Criminal Court of the City of New York, presided over Mr. Salem's cases under docket No. 2014NY088542 in Part F of the Criminal Court.    Stephen Pokart of the Legal Aid Society appeared on behalf of Aitabdellah Salem.

115.   Mr. Salem, however, was not produced in front of Judge Sokoloff on February 11, 2015.

116.  Upon information and belief, The Warden, Tour Commanders, and Captains knew about Salem's reduction in bail to one dollar and that he was ordered released from custody as well as their knowledge that Salem should have been brought to court on January 21, 2015, however, these municipal Defendants chose to ignore the court orders to release Salem and instead issued instructions to its employees not to comply with the court orders for Salem's release from incarceration.

117.  Instead of releasing Salem on January 21, 2015, and on February 11, 2015, Plaintiff was strip searched, and returned to Rikers Island.

118.  On April 15th, 2015, one hundred thirty eight days after Mr. Salem mandatory release date, bail in the amount of $ 1.00 was paid by a Rev. Cato whom Mr. Salem had never met and Plaintiff was finally released from incarceration.  See **Exhibit "C"**. (bail receipt for $1.00)

119. Mr. Salem at all times throughout the relevant period, possessed the $1 which he could have easily paid for his bail had the supervisory Defendants informed him of his right to be free on one dollar bail.

120. Upon Mr. Salem's release on April 15, 2015, Salem was told by Captain La Fleur "that if anybody asks you who paid your bail, tell them that Rev. Cato paid it".

121.  Captain La Fleur, upon information and belief knew that her supervisors, the Wards, Tour Commanders and other public officials had directed her and other correction officers not to release Salem.   That it is believed that Captain La Fleur ignored the orders of her supervisors and paid the one dollar bail on behalf of Salem.

122. Upon information and belief, the New York City Department of Correction instituted a practice of holding pretrial detainees in custody on one dollar ($1) without informing the

detainees that their bail status had been reduced to one dollar, an amount that each of the detainees was able to pay.

123. The practice of holding pretrial detainees on $1 bail is widespread throughout the New York City Department of Correction.

124. The New York City Department of Correction through its unlawful police and practice has knowingly and purposefully held pretrial detainees in custody on one dollar bail without informing the detainees that they could be released from incarceration by paying one dollar.

125.  The intent of the practice was meant to punish the detainees.

126.  That the Defendants' custom and practice was so widespread that it became the policy of the Department of Correction to hold pretrial detainees on one dollar bail.

127. That the Defendants' policy of holding pretrial detainees on one dollar bail is objectively unreasonable which violates the Substantive Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

128. That holding Mr. Salem and other pretrial detainees on one dollar bail is an abuse of governmental power which is strictly forbidden under the Substantive Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

129. That Commissioner Ponte, and the other unidentified municipal Defendants refusal to adhere to court orders to release Salem and holding the Plaintiff and other pretrial detainees on one dollar bail acted with deliberate indifference to Mr. Salem and hundreds of other pretrial detainees constitutional rights.

130.  The Defendants had ample time to reflect on the criminal court orders to release Salem on November 28, 2014, and again on January 15, 2015, and to comply with the Judges orders to the DOC to release Salem.

131. There is no governmental interest of New York City Department of Correction to hold pretrial detainees on one dollar bail.

## FAILURE TO TRAIN, MONITOR OR SUPERVISE

132. In deciding who, when where, and how to release pretrial detainees, the DOC has instituted several procedures provided in the General Office Manual promulgated by the New York City Department of Correction.

133. Municipal employees assigned to the DOC General Office where records are kept and processed, are supposed to receive training, monitoring and supervision in order to ensure that inmates are produced to court and timely released upon changes in their status of detention.

134. The following measures found in the New York City Department of Correction General Office Manual set forth written procedures that employees of the DOC must follow to ensure compliance with 1) Processing Court Orders, 2) Processing Court Orders to Produce Inmates to Court, 3) Processing Court Orders that Change Detention Status of Inmates, 4) Processing Court Orders to Discharge Defendants, 5) Processing Criminal Court Orders to Discharge Defendants, and 6), Processing Court Orders that Change Detention Status  at the Housing Facility (AMKC)*,* Court Production , and Processing Bail payments.

135. That the municipal employees failed to receive adequate training, monitoring and supervision, which caused Salem's extended  period of incarceration of one hundred thirty eight days without due process of law.

### *The Department of Correction Failure to Process Court Orders*

136.  The New York City Department of Correction has enacted procedures for employees of the D.O.C. to follow upon receipt of Court Orders.

22

137.  The Department of Correction's General Office Manual (GOM) Chapter 6: Court Orders discuss several types of Court Orders and how the Department of Correction personnel are supposed to comply expeditiously with such orders. **Processing Orders to Produce**" General Office Manual Chapter Six.  These types of Orders direct the D.O.C. to produce inmates before the issuing court.

138.  An Order to produce is an order from the Court to have an inmate produced in a specific court part, at a specific date and time.

139.  If the Order to Produced (OTP) is for a docket number with an existing securing order, the OTP comes back with **"Order Satisfied** or Dismissed' written on it. The D.O.C. personnel are supposed to read the original securing order to determine if an inmate's docket number is dismissed.

140.  A securing order is a legal document (form 299) generated by the Court which authorizes the New York City Department of Correction to detain an individual. It contains all pertinent information concerning an inmate's case.  The Court officers use it to record a chronological record of what happens in the case.

141.  The D.O.C. is responsible for processing Court Orders by following a sequence of steps found in the General Office Manual.

142.   The first step requires D.O.C. personnel to verify that the inmate is in custody and is housed at the particular facility, i.e. AMKC by using the IIS (Inmate Information System) system. The procedures for verification are by logging onto the QINQ Screen and imputing the inmates booking and case number or the NYSID (New York State Identification Number) to open the screen for that particular inmate.  The next Court date field should indicate the next date and time of appearance for the particular inmate.

143.   The next step in the processes for processing Court Orders is to "pull the Accompanying and Detention Cards" This process is done manually. If the accompanying card is missing, this may indicate that the card was filed for another case.

144.   The D.O.C. personnel are then required to pull the inmates "Detention Card", from the QINQ screen which is filed alphabetically. This process is also conducted manually. The detention card should include the inmate's next court appearance date.

145.   The next step in the process of processing Court Orders is to have the staff members within the Department of Correction to "Match Accompanying Card Information against the document. The accompanying card includes changes made by the court in detainees' bail status, and orders from the court that required the immediate release of inmates.

## *B: Processing Court Orders to Produce*

146.   Correction officers and Staff members of the DOC are responsible for processing Court Orders to produce are required to advise the Court that an Inmate is **not available to be produce on a particular day** and the reasons for the non-production of the inmate. The Department of Correction uses an "Undelivered Defendant Form" to advise the Court that an inmate will not be present in Court.

147.   The D.O.C. staff members responsible for preparing the Court Orders to Produce are also responsible for updating the inmates' "Detention Card" in the Court Appearance, on the IIS, section by entering the date, the docket number, the court, and the court part where the inmate is to appear on the Order to Produce. In addition, D.O.C. personnel are then directed to update the IIS to add the name of the inmate to the Court List as per instructions found in the GOM section 6.4.4. (5)

148.  In order for the inmates such as Salem to appear on the court manifest for the return date listed on the Order to Produce, the OTP must be entered in the CC screen of the IIS. The D.O.C. staff is required to enter the bail amount in the bail screen reflected in the IIS. 6.4.2(5). Once the D.O.C. personnel enters the Order to Produce in the CC screen with the next court date, the inmate will appear on the Court manifest and the system will then generate a Form 44A for the inmate.

149.  The next step in processing Court orders calls for the D.O.C. staff to staple the Order to Produce to the Accompanying Card and to file the Card in the slot for the next day.

150.  After the inmate returns from Court on the Order to Produce appearance, and once the order has **been satisfied**, D.O.C. personnel are required to file the Order to Produce in the inmates' record envelope/legal folder, and then enter "Void" in the Disposition filed to close out the record.

151.  Plaintiff Salem was ordered to appear in criminal court on November 26, 2014, November 28, 2014, January 21, 2015, and on February 11, 2015. He was never produced by the D.O.C.

152. The Department of Correction, through the Commissioner, Wardens, Deputy Wardens, Tour Commanders, Captains, and Correction officers, knew or should have known of the Orders to Produce Plaintiff Salem on the aforementioned dates and provided the necessary supervision required by its municipal employees to ensure compliance with the court orders to produce.

153.  That the Defendants, and other staff members, agents, and employees of the New York City Department of Correction, deliberately failed to follow the guidelines set forth in the Department of Correction General Office Manual related to the procedures they are required to follow regarding receipt of Court Orders requiring the D.O.C to produce inmates in court and in

releasing inmates from custody. The Defendants' willful and deliberate indifference resulted in Salem's unlawful detention of 138 days.

154.   That the failure to produce and timely release Salem was intentional, knowingly and willfully committed by the Defendants and other members within the Department of Correction.

155.   That on January 15, 2015, the Hon. Justice Mennin ordered the Warden at the Anna M. Kross correctional facility at Rikers Island to "… deliver the said defendant in **CIVILIAN CLOTHES** into the custody of the Commissioner of Correction of the City of New York, and it is further, **Ordered** that the Commissioner of Correction receive the said defendant form the said Warden and produce in Part F, on January 21, 2015, at 9:a.m. of that day at the Courthouse located at 100 Centre Street." See **Exhibit "B".**

156.   That the Order to Produce by Judge Felicia A. Mennin was received by the New York City Department of Correction and **marked " Order Satisfied 1-21-15 Dfucco**" ( emphasis ) See **Exhibit "B"**

157. Plaintiff was not produce in Criminal Court on January 21, 2015 as ordered by Judge Mennin. Yet, the Department of Correction signed the order and wrote on the order that the Order to Produce was satisfied when in fact in was not satisfied, Salem was not brought in open Court. Nor was he released as ordered.

158. That the Department of Correction willfully, and knowingly, ignored Judge Mennin's Court Order to Produce Salem in Civilian Clothes for the purpose of his release.

159. That the Order to produce was written satisfied by someone within the Department of Correction who knowing falsified a Court record.

160.  That the City of New York, through the New York City Department of Correction and the Defendants herein, were deliberately indifferent Salem's constitutional right to be free from unlawful incarceration at Rikers Island.

161. That the Department of Correction failed to supervise, or monitor its employees in the required procedures for processing Court orders which changed the detention status of Aitabdellah Salem due to the DOC's deliberate indifference to the constitutional injury of extended incarceration of Salem and other pretrial detainees without due process of law.

### C: Processing Orders that Change Detention Status 6.5

162.  That the New York City Department of Correction set forth procedures found in Chapter 6 of the Department of Correction General Office Manual titled: Court Orders, Processing Order that Change Detention Status.

162. According to Section 6.5 of the General Office Manual," Certain orders change the detention status of an inmate, and modify the securing order that functions as the inmate's commitment to custody.  These orders are known as **Superseding Court Orders** and include **orders that direct the release of the inmate, order the release of the inmate upon his or her own recognizance or change the bail condition, or otherwise change detention status.**" Id.

163. Section 6.5.1 " General Rules for Processing Orders that May Release an Inmate" clearly states that " Whenever a court issues a superseding court order that **changes the detention status of an inmate in a way they could or will lead to the inmate's release,** D.O.C. personnel must act with **expedience** to carry out the court's instructions.  The Court order must be faxed from the courthouse to the housing facility and the GO (General Office) must begin processing the faxed order without waiting for the original order to arrive by interoffice mail, Once the fax copy of the order has been verified as authentic in the procedure described below, you may

discharge the inmate (if there are no other holds) without waiting for the original order." **Id**.  The

Department of Correction also has procedure for employees to follow when the court changes the

detention status of an inmate while in Court.

### *D: Processing Court Orders that Change Detention Status at the Courthouse.*

164.  The New York City Department of Correction had a duty on November 28, 2014, to begin

the sequence set forth below which would have timely released Plaintiff from Rikers Island upon

Court Order.

165.  A  Department of Correction court facility officer receives the order from a court and is

supposed to check it to ensure it has all necessary information, The information should include

inmate's name, NYSSID number, indictment or docket number, issuing court part, next court

date, bail status, issuing date, and signature of a court clerk or judge.

166.  The Court facility officer of the New York City Department of Correction is then

responsible for verifying that the inmate (Salem) is in D.O.C. custody.

167.  The court facility officer is then required to call the General Office at the inmates' housing

facility (AMKC) **NOTIFYING THEM OF THE ORDER**. (Emphasis)

168.  The court facility officer then faxes the court order, retaining the fax confirmation receipt

and also calls the GO to confirm they received the fax.

169.  The court facility officer then logs the order in the legal documents logbook, keeps a copy

of the order, and files the order manually.

170.  The officer sends the original order to the housing facility by a DOC Transportation

Division Messenger.

171.  That when an inmate such as Salem is housed in a facility at the D.O.C. and a change in his detention status occurs, the Department of Correction must institute the following procedures to ensure that court orders are carried out.

### E: Processing Court Orders that Change Detention Status at the Housing Facility (AMKC)

*172.*   That a General Office member of the New York City Department of Correction should in accordance with the procedures outlined in GOM 6.5.1, process the court order as soon as it arrives by fax.  The staff member does not need to wait for the original order. The D.O.C. member then is responsible for;

1. Confirm Validity of Fax.  When the sending court facility officer calls to make sure the fax was received and to confirm that it is a valid order, the GO staff member who receives the call writes down the name and shield number of the officer who is calling.

2. Document Verification: On the back of the faced court order, the GO staff person writes the following information:

- Name and shield number of the court facility correction officer who confirmed the validity of the order.

- Date and time of confirmation

- Name and shield number of the GO staff person who confirmed the information with the court facility correction officer.

3.  Attach Order.  The D.O.C. staff member should then staple the superseding court order that the securing order it modifies, Both must be stapled to the Accompanying Card.

4.  Perform Other Processing: The D.O.C. staff member is required under the procedures set forth under General Office Manual, Chapter Six at 6.5.1. to perform other actions needed to

complete the process to comply with Court Orders such as the processing an Order to Discharge Defendant.

## *F: PROCESSING ORDERS DISCHARGING DEFENDANTS.*

*173*.    The New York City Department of Correction is responsible for acknowledging the fact that "The court that directs the immediate release of an inmate issues this order". **New York City Department of Correction General Office Manual: Chapter 6, at paragraph 6.5.3.**

174.    That the staff members responsible for initiating the procedures for processing an order discharging Defendants are required to first verify that the inmate is present in the facility using the Accompanying Card, and the Inmate Information System. (IIS)

175.    That once the personnel completes step one the staff member is then responsible for "Pulling Records".    The staff at the Department of Correction in the General Office is responsible for manually pulling the inmates' Accompanying Card filed by the inmate's next court date which is found on the QINQ screen, CC screen or the Detention Cards which is filed alphabetically. **Id**.

176.  The next step in processing on Order Discharging an inmate is by confirming the information. This requires the Department of Correction personnel to check that the information on the discharge order matches the information of the securing order for which discharge is given. The securing order is supposed to be attached to the Accompanying Card.

177.  Staff members are responsible for updating the IIS by entering the reason for the discharge in the Disposition field of the CC screen, as given on the Discharge Order. i.e. ROR, (Released on own recognizance.)

178.  The next step that should have been done by the Department of Correction staff personnel is to "Update the Accompanying Card and Detention Card". The instruction in updating the Detention Card is found in Chapter two of the GOM. **Id**.

179.  That after updating the accompanying card, and Detention Card, the staff member is then responsible for checking for any other cases, warrants or detainers.

180.  If there are no other holds, the inmate should be discharged.  Salem had no other holds or warrants on November 28, 2014.

181.  That when an order is faxed to the facility such as the AMKC where Salem was being held, the original document will follow in the mail and the staff members is then held responsible for entering it in the legal mail logbook and filing it in the inmate's record envelope, and legal folder.

### *G: PROCESSING A CRIMINAL COURT DISCHARGE ORDER*

182.  This order was issued by the Hon. Justice Mellisa Crane on November 28, 2014 which the New York City Department of Correction knowingly and willfully failed to process without an objective legitimate penological interest.

183.  The procedures for processing a criminal court discharge order are found in the New York City's Department of Correction General Office Manuel, Chapter Six at paragraph 6.5.6.

184.  The Department of Correction acknowledges the fact that this type of order is issued by the Criminal Court, ordering the immediate release of inmates from D.O.C. custody. **Id**.

185.   This Order also notifies the defendant of his next scheduled court appearance date and court part.

186.   The order is generally used when an inmate is released on his own recognizance (ROR) **Id.**

187.   The criminal court discharge order should be faxed by the Department of Correction court facility officer to the housing facility pursuant to Department of Correction Operation Order 02/04. (AMKC)  **Id.**

188.   The instructions on confirming faxed court orders are found in General Office Manual Section 6.5.1

189.   After verifying the fax order, the **General Office can proceed with the discharge process** without waiting for the original order. (emphasis)

190.   The General Office and members of the New York City Department of Correction personnel must then verify that the inmate is present in the facility.   Next, staff members are responsible for **pulling the inmates Accompanying Card and Detention Card**.   The Accompanying card contains information regarding the detainees change in bail status which clearly reflected that Salem's bail had been reduced to one dollar on November 26, 2014.

191.   The next step in following the procedures to process a Criminal Court Discharge Order is to confirm the information on the discharge order.

192.   Once it has been determined that a judge, or clerk has signed the Discharge Order, the staff member within the D.O.C. is then responsible for "**Updating the Inmate Information System** and Updating the CC screen.   The reason for the discharge order should be logged such as ROR, Released on Own Recognizance.  (emphasis)

193.   Next, the staff member is responsible for "**Updating the Accompanying and Detention Cards" by following instruction set forth in Chapter Two of the Department of Correction General Office Manual.** Again this procedures as well as the other steps and procedures mentioned herein require knowledge and training in the IIS and computer skills in order to effectuate the policies and procedures in complying with court orders and releasing detainees.

194. Next, the staff member is responsible for checking for other cases, warrants or detainers, if, as in the case of the Plaintiff, there are no other warrants or holds the D.O.C. staff member is responsible for following discharge procedures in found in the GOM, Chapter Nine.

## H: COURT PRODUCTION: GENERAL OFFICE MANUAL CHAPTER 7

195. The New York Department of Correction has a duty to produce inmates to their respective Court Order Appearances.

196. Chapter seven provides the staff members in the Department of Correction General Office at the Anna M. Kross Center guidance in following procedures to produce inmates in court.

197. According to the GOM, "The **production of inmates for court** and other appointments is one of **the key responsibilities of the General Office** and makes up a large part of the GO's **daily processing routine** through all duty tours. **It is a complex job**, requiring much care and attention to ensure that inmates get to where they need to go, on time and **with their paperwork in order." Department of Correction General Office Manual Chapter 7.** (emphasis)(The DOC however was reckless by leaving inmates in court's holding cells without having an opportunity to see a judge in the court room and to be involved in their criminal cases.

198. " The courts and attorneys rely on D.O.C. to deliver inmates on their scheduled court dates, when there is a problem, as when as an inmates misses court, it may not be the fault of GO. However, **unless the GO staff members have fully documented every step they took, they may take the blame. It is thus essential that GO Staff keep meticulous records on every aspect of court production. " . (** one again, the DOC knowingly and recklessly failed to ensure this section of the GO by knowingly leaving detainees in holding court holding cells where they remained without the benefit of being brought to the court room). The DOC was required to

document the fact that Salem's bail had been reduced to one dollar and that he was required to be brought to court in civilian clothes)

199.   Staff members at the D.O.C. are required to prepare paperwork for court production by preparing form 44A for the next day court appearances, and to institute other procedures to ensure compliance with the production of an inmates to court, which is essential in ensuring the inmates' due process of law to provide inmates with an opportunity to be heard, and to challenge court decisions which involve the inmates' confinement.

200.   On the day before the inmate is scheduled for a court appearance, the staff at the D.O.C. must run a Court Manifest for the next day's Court Appearances. This shows all inmates who are scheduled to appear in court the following day.

201.   Once again, the process demands that the D.O.C. retain qualified members to be trained, and have computer skills, and knowledge of the New York City Department of Correction Inmates Information System.

202.   Staff at the D.O.C. must then enter the IIS and access the court manifest referred to as the "Next Court Date, Inmate Alphabetical List.   The staff must then proceed to run the list from the main menu, and thereby to the reports menu.

203.   Then in the Branch field, type "CDAT"AND PRESS ENTER. Enter "A" to select active inmates only. Press Enter again and Ctrl +D. The system will then display another screen, which requests that you enter your (D.O.C. staff) facility, i.e. AMKC. Enter the code and press enter.

204.   Next staff members are required to type in the date for the court production and then proceed to pull the inmates' individual Accompanying Card for the next day. The staffs are also required to pull the inmates' detention cards.

205. A form 44A is also required to be prepared by the D.O.C. staff in processing the Production of an Inmate to Court.

206.  Form 44A, "The Surrender of Inmate for Court Appearance Form" is **supposed** to be used whenever inmates **must be produced in Court**. GOM Chapter7.  This form is attached to the Accompanying Card which in turn is attached to all of the inmate's legal hold documents. **Id. (Salem's legal file at the DOC contained the order from Judge Mennin to produce Salem in civilian clothes on January 21, 2015. The DOC however willfully and knowingly ignored the information and produced Salem in prison clothes.**

207.  The Department of Correction acknowledges the fact that "**for some inmates the VIST TO COURT, RESOLVES THE CURRENT CASE.** Id. (Emphasis added)

208.   Form 44A informs court officials whether there are other holds against the inmate which may prevent the inmate from being released when the current case is resolved. (There were no other holds on Salem on November 28, 2014, other than one dollar bail.)

209.   Form 44A needs to be produced during the 3- 11 tour on the day before the inmates are due in court. **They should be generated AFTER inmates have returned from court and D.O.C. staff members have updated all records.** Id. (emphasis added)

210.   The staff at D.O.C. are informed that in order to ensure the accuracy of required information in Sections 1-3 of the form 44A, the staff member must pull the inmate's record envelope, and Accompanying Card, and review all documents associated with the inmate including securing orders , Accompanying Card ,and Warrants**. Id. at 7.7**

211.  Section 2 of form 44A, lists the "Hold Information". This section includes three boxes one of which must be checked. This document is originated from the court to inform D.O.C. of the status of the inmate.

212. That if the defendant is to be released, the Court will indicate in the **NOT BE RETURNED to the Custody of the New York City Department of Correction as there are no other charges, holds detainer or warrants pending.** (Emphasis added) (again the DOC had notice from the criminal court on November 28, 2014, and January 21, 2015, that Salem should not have been returned to Rikers Island.

213. That the criminal court indicated on form 44A on November 28, 2014, that Salem not be returned to the Custody of the DOC because Plaintiff was ordered released from custody.

214.  That the criminal court also indicated on form 44A on January 21, 2015, that Salem was not to be returned to the Department of Correction when he was ordered brought to court in civilian clothes.  The DOC knowingly and willfully ignored the court orders to release Salem.

215. When the computer system, IIS, is not working the staff members in the General Office at the Department of Correction are required to follow procedures under GOM Section 7.7.2 "Form 44A **Transcribing Manually."**

216.  That in the event of a system failure, the Department of Correction employees are responsible for following procedures in the GOM manual.

217.  That the D.O.C. is responsible for preparing an "Undelivered Defendant Form" whenever an inmate is not produced by the D.O.C. to a Court ordered appearance.  **GOM Section 7.8**.  The General Office **MUST complete an Undelivered Defendant Form**. The D.O.C. is responsible for indicating the reasons the inmate was not produced. (**Emphasis)**

218.  The procedures set forth herein were not followed during the time of Salem incarceration.

219. That the above described procedures are complex, and required and demanded meaningful training, monitoring and supervision of municipal employees in  the DOC general office to ensure compliance and to ensure that the detainees' constitutional rights are protected.

220. The DOC knowingly and willfully employed incompetent individuals who lacked the minimum skills and training in the procedures described above.  The duties and responsibilities of these correction officers and municipal employees were not monitored or supervised by the municipal Defendants.

221. These employees were placed in the general office without the required training due to the DOC's deliberate indifference to the obvious need for training.

222.  The DOC's failure to train the officers in the procedures described herein resulted in the municipal employees making a wrong decision not to release Salem from incarceration.

223.  The Defendants are believed to have instructed the municipal employees not to follow the described procedures and court orders that were received by the general office ordering the immediate release of Mr. Salem on November 28, 2014, and on January 21, 2015.

224. The Defendants' failure to train, monitor and supervise the municipal employees responsible for processing court orders and change in detainees bail status and discharge on the instructions and procedures contained in the Department of Correction's General Office Manual was in deliberate indifference to the known constitutional injury of depriving Salem and hundreds of other pretrial detainees of their to be free from unlawful imprisonment without due process of law.

225. The City of New York, through the New York City Department of Correction' policy and practice of failing to train, monitor and supervise its municipal employees in the General Office Manual relating to processing court orders to release and discharges pretrial detainees as listed above amounts to deliberate indifference to an obvious need for training and supervision of its employees in the specific areas listed herein.

226. That due to the complexity of the procedures set forth in the general office manual, the Defendants, Commissioner Ponte, Wardens , Assistant Wardens, Tour Commanders and Captain all knew, or should have known that  the failure to train and supervise their municipal employees responsible for processing court orders to release, produce,  and discharge pretrial  detainees such as the Plaintiff, would knowingly likely result in the municipal employees making wrong decisions which resulted in the over detention and deprivation of liberty of the Plaintiff and hundreds of other pretrial detainees.

227. That the Defendants were made aware on January 15m 2015, by Marks G. Peters, Commissioner of the New York City Department of Investigation of through an investigation of the DOC that the DOC had throughout calendar year 2014, engaged in a pattern and practice of hiring incompetent correction officers responsible for overseeing the care and custody of inmates and that such practice by the DOC was endorsed with deliberate indifference to the constitutional injury of inmates.

### *PRIOR NOTICE OF LACK OF TRINING, MONITORING AND SUPERVISON OF CORRECTION EMPLOYEES*

228.   The New York City Department of Correction has a pattern and practice of hiring incompetent and unqualified Correction Officers and failing to train monitor or supervise its employees.

229. On January 15, 2015, The City of New York Department of if Investigation, (DOI) Commissioner Mark G. Peters Commissioner issued a stinging report entitled" D.O.C. Report **Reveals Broken Recruitment System At Rikers Island and Deeply Flawed Application Process For Newly Hired Correction Officers.**

230.  The DOI report found the following flaws in the system of hiring correction officers at Rikers Island.

"Department of Investigation (DOI) Commissioner Mark G. Peters today issued a comprehensive review of the Department of Correction's (D.O.C.) hiring process for correction officers at Rikers Island, uncovering a deeply flawed system in which more than **a third of officers were hired despite numerous corruption and safety hazards, including multiple prior arrests and convictions, prior associations with gang members or relationships with inmates.** Equally troubling, the Applicant Investigation Unit (AIU), responsible for screening potential recruits, relied on **antiquated and haphazardly filed paper personnel documents** and had little to no access to software necessary to perform basis background and credit checks. As a result, D.O.C. has already replaced both its Director and Deputy Commissioner responsible for oversight of the AIU and responsible for the hiring of appo0lcants DOI reviewed assigned additional staff to the screening process and committed to an aggressive set of reforms in this area."   **New York City Department of Investigation Report on the Recruiting and Hiring Process for New York City Correction Officers. Mark G. Peters Commissioner, January 2015.**

231. The gravamen of Commissioner's Peters investigative report is that the investigation "exposes a shockingly inadequate screening system, which has led to the firing of many officers that are **underqualified and unfit for duty. Applicants with a history of violence or gang affiliations should not be patrolling our jails**. Position as law enforcement officers demand better. **Id**.  (emphasis added)

232.  The Commissioner's report also stated that there was an ongoing investigation in criminal activity and civil disorder at Rikers Island which **began in early 2014**. Id. (Emphasis) The report covered the calendar year 2014, the time during which Salem was incarcerated on one dollar bail.

233.  The report found that of the over 150 applicant's files of recently hired correction officer, "35% had significant red lags that should have either precluded their hiring or required significant follow up and monitoring by employees- neither of which was done." **Id.**

234.   In Addition, the Commissioner's report found that:

- 10 files indicating the applicant had been arrested more  than once,

- 65 files indicating the applicant's psychological exam raised some form of concern about his /her ability to perform his /her duties;

- 79 files indicating the applicant had friends or relatives who had been incarcerated. A number of files showing relationships included current inmates and situations in which significant contact over D.O.C. recorded telephone calls could not be explained; and

- 54 Files demonstrating the applicant clearly failed to exhibit the" good character and satisfactory background" of an officer.   These failures ranged from numerous prior arrest, unexplained telephone contact with multiple inmates, prior associations with known gang members, and significant financial instability demonstrated through wage garnishments and collection proceedings

- Nevertheless all of these applicants were hired. **Id.**

235. The Commissioner's report clearly stated that as of result of their investigation the Department of Correction "did not properly train staff assigned to handle candidate screen leading to "red flags" that were simply missed or lacked the appropriate follow-up.  D.O.C. also failed to review any recorded phone calls in its possession once it was discovered that an applicant had prior pone contact with an inmate.  Additionally, DOI found instances in which **D.O.C. was aware of an applicant's prior association with gang members, but failed to**

40

**coordinate with its own Correction Intelligence Bureau (CIB) to take the appropriate precautions, D.O.C. is also devoid of a meaningful recruitment strategy for correction offices after disbanding its Recruitment Unit in 2009.**" Id. (Emphasis added)

236.  That the actions or lack of actions thereof by the supervisory Defendants including Joseph Ponte as policy maker for the City of New York, the Warden and Tour Commanders and Captains the Anna M. Kross facility were adopted through a knowing failure to act by policy makers, of actions by his subordinates, that are so consistent that they have become custom.

237.  That the failure of the City of New York to respond to an obvious need for more training of the Department of Correction employees in such a manner as to show deliberate indifference to the risk that not addressing the need will result in constitutional violations.

238.  That it is unconscionable that the Defendants' failed to comply with court orders to release Salem from imprisonment which deprived Salem of his liberty for one hundred thirty eight days on one dollar bail without informing Mr. Salem that his bail status had been reduced to an amount that he was capable of paying had he been informed.

239.  It was objectively unreasonable for the Defendant's failure to produce Mr. Salem in court on January 21, 2015, in civilian clothes and to return him to Rikers Island where he was striped searched and sat inside a cell not knowing the one two different occasions, a New York City Judge ordered him released from custody.

239. The Defendants' failure to train and supervise its employee's was intentional and with deliberate indifference to Plaintiff's constitutional rights.

240. That the City of New York has for years been aware of the fact on the Department of Correction's inefficient implementation of the D.O.C.'s release procedures, and over detainment of inmates, yet the City of New York's officials acquiescence in a longstanding practice or

custom which constituted the standard operating procedure of the City of New York through the Department of Correction Rikers Island facility.

### FIRST CLAIM FOR RELIEF

**AGAINST THE CITY OF NEW YORK PURSUANT TO 42 U.S.C SECTION 1983 FOR THE UNLAWFUL POLICY AND PRACTICE OF HOLDING PRETRIAL DETAINEES IN CUSTODY ON BAIL OF $1 IN VIOLATION OF THE SUBSTANTIVE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO CONSTITUTION OF THE UNITED STATES .**

241. That plaintiff repeats, reiterates and realleges each and every allegation contained in Paragraphs Numbered"1 through "240" with the same force and effect as though more fully set forth at length herein.

242.  The New York City Department of Correction has instituted, maintained and tolerated a policy and practice of holding pretrial detainees on one dollar bail without informing the detainees that their bail status had changed to one dollar, and amount all detainees were capable of paying.

243. That" in assessing the reasonableness of Defendant's policy, the Court examines the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interest at stake." **Graham v. Connor**, 490 U.S 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443(1989)

244.  The Due Process Clause of the Fourteenth Amendment states that," no State shall deprive any person of life, liberty, or property without due process of law." **U.S. Const. amend. XIV, Section 1.**

245.  The Due Process Clause is intended to secure the individual from the **arbitrary excise of the powers of government**." **Daniels v. Williams**, 474 U.S. 327, 331, (1986) (quoting **Hurtado v. California**, 110 U.S. 516, 527 (1884).

246.    " Substantive Due Process , as recognized by the Supreme Court, **bars** " certain government actions regardless of the fairness of the procedure used to implement them," in order to' prevent governmental powers from being used for purposes of oppression "**Ying Li v. City of N.Y**. 246 F. Supp. 3d 578, (E.D.N.Y2017(quoting **Daniel v. Williams**, 474 U.S. At 331, **McClary v. O'Hare,** 786 F 2d 83, 88 (2nd Cir. 1986).

247. A claim arising under the Substantive Due Process Clause challenges the fact of the deprivation.

248.    That at all relevant times herein, Defendant City of New York, acting through its Department of Correction, developed implemented, enforced, encouraged and sanctioned de facto policies, practices and or customs exhibiting deliberate indifference to the Plaintiff's constitutional rights which caused the violation of such rights.

249.   The Defendant City of New York, acting through the DOC and acting under color of law permitted, tolerated and was deliberately indifferent to a pattern and practice of holding pretrial detainees in custody on bail of one dollar.

250.   This widespread practice constituted a municipal policy which was known and tolerated by the Commissioner of the Department of Correction, Joseph Ponte, and the Wardens, Tour Commanders, and Captains at the Anna M. Kross facility in Rikers Island which caused the constitutional injury to Mr. Salem.

251.   By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which the Plaintiff as a pretrial detainee was caused to be held in custody for one hundred thirty eight days beyond his release date, Defendant City of New York has deprived Plaintiff of rights, remedies, privileges and immunities guaranteed under the Fourteenth Amendment by Constitution of the United States.

252.    The policy, practice and custom of holding Aitabdellah Salem, and other pretrial detainees in custody on bail of one dollar without informing the detainees that their initial bail had been reduced to one dollar serves no governmental interest and is not rationally related to a governmental objective.

253.   That the Defendants knew of the criminal court order to produce Salem in court on January 21, 2015, in civilian clothes for his immediate release.

254.   The Defendants choose to ignore the court's order to produce Salem for his release and instead returned Plaintiff to Rikers Island where he remained until April 15, 2015, in deliberate indifference to Salem's right to be free from deprivation of liberty without due process of law.

255.   The Defendants' failure to comply with the January 21, 2015, court order knew and willful refusal to release the Plaintiff.

256.   That holding Salem in custody for one hundred thirty eight days was excessive to any governmental objective or purpose to continue Salem's incarceration.

257.   The Defendants willfully, deliberately and intentionally prevented Salem from being released from custody for five months with deliberate indifference to his Constitutional right not to be deprived of liberty without due process of law.

258.   The restriction and condition of Mr. Salem's liberty for one hundred thirty eight days, $1 bail, by the City of New York and its municipal employees, was intended to punish Mr. Salem prior to an adjudication of guilt.

259.   The Due Process Clause forbids a pretrial detainee to be punished.

260.   The Defendants had time to deliberate and process whether or not they were going to comply with the court orders to release Salem and to produce him in court in civilian clothes.

260.  The Defendants deliberately chose not to comply with the court orders stated above and held Salem in custody without justification.

261.   That the holding of the Plaintiff and other similarly situation pretrial detainees on one dollar bail without informing the detainees that their bail had in fact been reduced to one dollar violates the Substantive Due Process Clause of the Fourteenth Amendment.

262.  The court should infer that because the jailers at the AMKC facility had time to deliberate on the conditions of confinement such as holding pretrial detainees on one dollar bail without informing the detainees that there bail had in fact been reduced to one dollar, the court may infer that the policy and practice by the government amounted to abuse and served no legitimate governmental objective and its only purpose was to punish Salem and hundreds of other pretrial detainees.

263.  That government officials who act with deliberate indifference to constitutional rights, have been found to have shocked the conscious of a civilized society.

264.  The deliberate indifference standard is applied in non -emergency situations because governmental officers had ample time for reflection to decide what course of action they should take in response to the situation which the officers faced.

265. That the Defendants intentionally, and, recklessly subjected pretrial detainees such as Salem to the condition of being confined to a penal institution on one dollar bail.

266.  That holding pretrial detainees on one dollar bail without informing the detainees that their bail had been reduced to one dollar, is objectively unreasonable.

267.  That conditions or restrictions of confinement of pretrial detainees are now governed by an Objective Reasonableness Standard. The "shocked the conscious standard" is no longer

applicable to condition of confinement of pretrial detainees. **Kingsley v. Hendrickson**, 135 S. Ct. 2466 (2015)

268.   The core of the Substantive Due Process Clause is for the protection against governmental abuse of power.  The municipal Defendants' deliberate failure to release Mr. Salem and hundreds of other pretrial detainees due to the policy and practice of holding pretrial detainees on one dollar bail is an absolute abuse of the power by the City of New York.

269.  The Defendants, City of New York,   New York City Department of Correction, Commissioner Ponte, Tour Commanders, Wardens and Captains failure to release Salem and other pretrial detainees was willful and purposeful which cause the constitutional deprivation to Salem and hundreds of other pretrial detainees.

270.   The United States Court of Appeals for the Tenth Circuit recognized the constitutional injury suffered when a pretrial detainee is not informed of his bail status by municipal employees.    In **Gaylor v. Does**, 105 F.3d 572 (1977), the appellant court reversed summary judgement for the City of Denver, Colorado holding that the municipality had an official  policy in effect of informing if the Denver  jail to inform any inmate of his bond amount only "if he asks for same". **Id**.

271. The Gaylor Court also found that if Gaylor had been advised with reasonable promptness after his bail amount was entered in the computer, Gaylor would have been able to make bail arrangements promptly and been release. The Court reversed summary judgment and found that Gaylor had been held in custody for four days without knowledge his bail status.  The Court here also held that there was no legitimate goal in defense of the deputy's actions and omissions which allegedly caused for days of unnecessary detention of Gaylor for a policy of informing a detainee of his bond status only 'if he asks for same". **Id**. The restriction or condition was

according to the Court, not reasonably related to a legitimate goal by the City and it appears arbitrary or purposeless under the **Bell v. Wolfish** analysis. **Id**.

272. Similarly, Salem repeatedly asked those officials in the AMKC facility about the status of his case.  The Defendants in the instant case refused to inform Mr. Salem that his bail of $50,000 had been reduced to one dollar, an amount Salem was able to raise had he been informed. Salem was held on a policy and practice such as that in Gaylor, for one hundred thirty eight days.

273.  That the New York City Department of Correction's policy of holding pretrial detainees in custody without informing them of their bail status serves no legitimate purpose.

274. That The City of New York, the New York Department of Correction and the individual municipal Defendants were deliberately indifferent in their failure to act upon knowing that Salem and other pretrial detainees bail had been reduce to an amount that they were all able to raise.

275. That pursuant to a policy and custom of the New York City Department of Correction known to policymakers, Plaintiff Salem was deprived of his constitutional right to be free from the deprivation of liberty without due process of law for one hundred thirty eight days.

276.  The New York City Department of Correction administrators, policymakers supervisors and employees caused the intentional, unjustified overdetention of Mr. Salem by their deliberated indifference to the risk of constitutional injury of overdetention in failing to train, monitor and supervise the municipal employees in procedures in releasing detainees from the court house, releasing detainees from the housing facility within the DOC, processing court orders demanding the immediate  release of detainees and producing inmates to their appearances in court describe more fully throughout paragraphs 70- 223, and maintaining and acquiescing in a policy and practice of holding pretrial detainees on one dollar bail.

277.  That at all relevant time such New York City Department of Correction employees were acting within the scope of their employment, their acts were motivated by a desire to further the interests of the DOC, and as such the DOC officials and employees were acting in furtherance of the business of the New York City Department of Correction.

278.   The Department of Correction' actions and failure to act as described above, directly and proximately and affirmatively were the moving force behind the DOC's failure to train, monitor and supervise their employees in releasing inmates upon court orders and the failure by the DOC to produce Salem in civilian clothes on January 21, 2015, which violated the Due Process Clause of the Fourteenth Amendment.

279. As a direct and proximate result of the policy and practice detailed above, Mr. Salem sustained serious psychological damages during his unlawful captivity.

**SECOND CLAIM ON BEHALF OF PLAINTIFF AGAINST ALL DEFENDANTS UNDER 42 U.S.C SECTION 1983 FOR VIOLATING THE PROCEDUAL DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES**

280. That Plaintiff repeats, reiterates and realleges each and every allegation contained in Paragraphs "1 through 279", with the same force and effect as though more fully set forth at length here herein.

281.  The Due Process Clause of the Fourteenth Amendment governs claims made by pretrial detainees who were subjected to the deprivation of liberty by government officials.

282.  Courts throughout the country have long held that inmates' right to due process may be violated if they are not released within a reasonable time after the reasons for their detention have ended.

283. The analysis of whether plaintiff states a claim for improper deprivation of a liberty or property interest occurs in two steps. **Narumanchi v. Bd. of Trustees of Conn. State Univ**., 850

F.2d 70, 72 (2d Cir.1988). "The threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." **Id.** "*If* a protected interest is identified, a court must then consider whether the government deprived the plaintiff of that interest without due process." **Id.**

284.  That "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action" **Foucha v. Louisiana**, 504 U.S. 71, 80 (1992).

285.  The Due Process Clause is broadly construed.  "[D] process is flexible and calls for such procedural protections as the particular situation demands" **Morrissey v. Brewer,** 408 U.S. 471 (1972).

286.  That Plaintiff was held one hundred thirty eight days without legal justification. Eighty Four of those days of captivity occurred after Judge Mennin ordered the Department of Correction to produce Mr. Salem in criminal court in civilian clothes obviously for the purpose of being released from custody on January 21, 2015.

287.  That Judge Mennin's order to produce Salem in civilian clothes was made directly to the Commission of the DOC and to the Warden at the AMKC facility.

288.  The purpose of the order was to notify the Defendant that by Salem was to be released from custody on January 21, 2015.

289.  The Defendants willfully and purposefully disobeyed Judge Mennin's order to [produce Salem in civilian clothes on January 21, 2015.

290.  The DOC did not instruct Salem to change into his civilian clothes in accordance with the court order.   Salem  produced in the Court room on January 21, 2015.

291.  That  " Even if an inmate's initial confinement was justified by a constitutionally adequate basis, that confinement cannot constitutionally continue once that basis no longer exists" **Barnes v. District of Columbia**, 793, F. Supp 2d 260, 275 (.D.D.C. 2011) **Cannon v. Macon Cnty.**, 1 F.3d,1558, 1563 (11th Cir. 1993)(recognizing"[t]he constitutional right to be fee from continued detention after it was or **should have been known that the detainee was entitled to release"**(Emphasis added)

292. That  "[T]he great weight of precedent suggest that release must occur within a matter of hours after the right to it accrues, and that after some period of hours-not days- a presumption of unreasonableness, and thus unconstitutionality, will set in." **Barnes v. District of Columbia**, 242 F.R.D. 113,117 (D.D.C.2007) see also **Berry v. Baca**, 379 F.3d 764, 773 (9th Cir. 2004) (**Reversing granted summary judgment in favor of county sheriff where plaintiffs contended they were detained twenty-six to twenty- nine hours after a court ordered their release**.") and see **Davis v. Hall**, 375 F.3d 703, 713 (8th Cir. 2003)( noting that "**even a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment")** (Emphasis added)

293. That the Defendants have employed a gross abuse of power, unfair procedures, and unfair practice of failing to produce pretrial detainees to Court on their Court ordered date of appearances, and the omission of such procedures to inform a pretrial detainee of judicial decisions rendered in the absence of the detainee's presence in Court, constitutes a gross violation of plaintiffs' right to be free from the depravation of liberty without due process of law.

294. That the administrative procedures by the New York City Department of Correction were constitutionally deficient which caused Mr. Salem to remain incarcerated beyond his court ordered release date of November 28 2014, and January 21, 2015.

295. Mr. Salem, as a pretrial detainee, has a Fourteenth Amendment liberty interest and a Due process interest in being released from incarceration on time and upon Court Order.

296.  Excessive confinement of an inmate constitutes punishment which is forbidden under the Due Process Clause.

297.  The municipal Defendants, Joseph, Ponte, John Doe No. 1, Warden, John Doe No. 2, Assistant Warden, John Doe No. 3, Tour Commander, John Doe No. 4, Captain, all of whom are or were employed at the New York City Department of Correction at Rikers Island Anna M. Kross Center between November 28th, 2014, and April 15th, 2015, were on notice of their obligation to the Plaintiff to release him in a timely manner.

298.  The municipal defendants were aware or should have been aware that their failure to release Plaintiff in a timely manner constituted a violation of Mr. Salem's right to due process as a pretrial detainee.

299.  Upon information and belief, the municipal defendants and other supervisory employees at the Rikers Island facility whose names are presently unknown, were have engaged in a pattern and practice of not timely releasing pretrial detainees and other inmates held in custody at the Department of Correction based on a policy instituted by the DOC of not informing pretrial detainees of the fact that their initial bail had been reduced to one dollar.

300.  The detentions of pretrial detainees on one dollar bail is widespread and well known by the municipal policy makers as to constitute a custom and practice.

301.  Despite the known risks that inmates such as the Plaintiff were subject to unlawful prolonged incarceration due to the failures of the Department of Correction to comply with Court orders for the release of inmates, the municipal Defendants were deliberately indifferent to the

Plaintiff's constitutional right to be free from unlawful confinement of one hundred thirty eight days beyond his Court ordered release date.

302. Joseph Ponte, and the other municipal Defendants, the Warden and Tour Commanders and Captains at the Anna M. Kross facility in Rikers Island and agents of the jail, recklessly and deliberately ignored the Plaintiff's Constitutional rights.

303. The reckless disregard for the Plaintiff's liberty and other pretrial detainees is objectively unreasonable.

304. That the Plaintiff had a clearly established right to be released from incarceration on January 21, 2015, upon order of the court that the Defendants produce Salem in civilian clothes and that the Defendants violated that right when they failed to bring Salem into court to be released from custody.

305. "Under the Due Process Clause, a detainee may not be punished prior an adjudication of guilt" **Bell v. Wolfish,** 441 U.S. 520 (1979). Moreover the Court held that ""if a restriction or condition [of pretrial detention] is not reasonably elated to a legitimate goal- if it is arbitrary or purposeless- a court permissibly may infer that the purpose of the government action is punishment that may not be constitutionally be inflicted upon detainees" **Id** at 535.

306. That the Defendants' failure to inform Plaintiff that his bail had been reduced to $ 1 and that he was ordered to be released and the Defendants' failure to produce Salem in open Court was in response to the Defendants' deliberate effort to punish Salem and hundreds of other pretrial detainees in violation of the Due Process Clause.

307. That a detention is deemed arbitrary –even if conducted according to existing law if it is manifestly **disproportional, unjust or unreasonable.**

308. That holding inmates in custody on $ 1 bail is manifestly disproportionate, unreasonable, unjust, and constitutes arbitrary detention in violation of the due process clause contained under the Fourteenth Amendment.

309. That City of New York is liable by virtue of it deliberate indifference under 42 U.S.C. Section 1983 is liable to the Plaintiff for the constitutional injuries suffered by Mr. Salem.

310. The Department of Correction' actions and failure to act as described above, directly and proximately and affirmatively were the moving force behind the DOC's failure to train, monitor and supervise their employees in releasing inmates upon court orders and the failure by the DOC to produce Salem in civilian clothes on January 21, 2015, which violated the Due Process Clause of the Fourteenth Amendment.

311. As a direct and proximate result of the policy and practice detailed above, Mr. Salem sustained serious psychological damages during his unlawful captivity.

## THIRD CLAIM FOR RELIEF

### AGAINST THE CITY OF NEW YORK, PURSUANT TO 42 U.S.C. SECTION 1983 FOR FAILURE TO TRAIN, MONITOR AND FAILURE TO SUPERVISE ITS MUNCIPAL EMPLOYEES.

312. That the plaintiffs repeats, reiterates and realleges each and every allegation contained in Paragraphs Numbered "1 through 311", with the same force and effect as though more fully set forth at length herein.

313. That at all times herein mentioned the Defendant Department of Correction employees involved in the incident complained of herein, were negligently hired, trained, supervised, disciplined, and retained by the defendant, City of New York.

314. That the acts complained of herein resulted from the Defendants City of New York, and the New York City Department of Correction, through their agents, servants and employees,

breaching its duty to properly assign, train, supervise, discipline and retained its employees within the Department of Correction.

315. That the City of New York failed to train, supervise, or discipline the municipal Defendants named herein procedures stated herein throughout paragraphs 70- 223, which caused the unlawfully detention of Plaintiff Salem for one hundred eight days beyond his court ordered release date without probable cause or legal justification.

316. That the defendant City of New York's failure to properly assign, train, supervise or discipline its Department of Correction employees including the named Defendants involved in this incident herein, constituted a past pattern and practice of the DOC's failure to train and supervise those correction officers during the entire calendar year of 2014. That based on the previously established pattern and practice of the DOC failure to train and supervise its correction officers as found and documented by the internal investigation of the DOC through the efforts of Mark Peters, which Salem alleges deprived him and hundreds of other pretrial detainees to be held in custody beyond their court ordered release dates.

317. That the Commissioner of the DOC was therefore on notice of the  DOC deliberate failure to train and supervise its municipal employees that come into contact with the detainees and that were responsible for initiation those procedures to release and discharge detainees upon orders from the criminal court.

318. That the Defendants', acquiescence, and a tolerance of ongoing unconstitutional detentions, and seizures, allowed the Defendants to believe that they could violate plaintiffs' constitutional rights with impunity.

319. By reason of the foregoing, the individual defendants individually, and through defendant's agents, servants and employees, failed, and refused to use such care in the performance of their

duties as a reasonably prudent correction enforcement employees would have used under similar circumstances, thus resulting in significant emotional injuries to the plaintiff including his loss of liberty for one hundred thirty eight days.

320. That the City of New York is liable for the underlying constitutional violations committed by non- policy makers employees due to the fact that the City's policy and customs of inaction is objectively deliberately indifferent to the likelihood that a constitutional violation would occur.

321. That there was an obvious need for additional training and supervision which the City was aware of and willfully and deliberately failed to provide.

322. Upon information and belief, all of the Individual Defendants and municipal employees assigned to work in the general office were unfit and incompetent for their positions.

323. Upon information and belief, Defendant City's negligence in screening, hiring, training, disciplining, and retaining the Individual Defendants proximately caused each of Plaintiff's injuries.

324. The individual Defendants, Commissioner Ponte, the Warden, Assistant Warden, Tour Commanders, and Captains at the Anna M. Kross facility in Rikers Island, as supervisory officials, knew about the unconstitutional acts and actions of their subordinate of failing to processes court orders to release Plaintiff Salem on November 28, 2014, and January 15, 2015 and January 21, 2015,.

325.  Upon information and belief the individual Defendants personally participated by directing their subordinates to ignore processing of court orders to release Salem.

326.  The individual Defendants' participation in denying Salem his freedom by following the municipal policy, custom and practice that was in effect from November 28, 2014, through April 15, 2015, of not informing pretrial detainees of their right to be released from custody due to the

change in the pretrial detainees bail status to the amount of one dollar which Salem, and hundreds of other pretrial detainees were able to pay.

327.  In addition, the individual Defendants were casually connected to Salem's deprivation of liberty based on the municipal policy and practice of holding pretrial detainees in custody on bail of one dollar without informing the detainees that their bails status had been reduced to one dollar. The custom and practice by the municipal Defendants was promulgate and tolerated with deliberate indifference to the pretrial detainees constitutional rights.

328. The individual Defendants are also liable based on the individuals causal connection which caused Salem's deprivation of liberty because the Commissioner, Wardens, Tour Commanders and Captains at the Anna M. Kross facility received notice from the court by fax and by regular mail that Salem was ordered released from custody on November 28, 2014 although he had bail in the amount of one dollar on another case which the Defendants knowingly and purposefully failed to inform him that the status of his earlier bail in the amount of $ 25,000 had been reduced to one dollar for which Salem was able to pay.

329. That upon information and belief the supervisors at the Anna M. Kross facility directed their subordinate employees not to engage in the procedures set forth in the general office manuals which provided guidance on discharging Salem and other pretrial detainees form custody upon court order and change in the status of bail because of the policy not to inform pretrial detainees that their bail had been reduced to one dollar.

330. The Commissioner of the New York City Department of Correction, the Warden, Tour Commanders and Captains were deliberately indifferent to the constitutional injury to Salem and other pretrial detainees.

331. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Salem has suffered and continues to suffer psychological pain and mental anguish.

332.  That by the conduct of the Defendants, as described herein, the City of New York is liable to the Plaintiff under 42 U.S.C. Section 1983 for the violations, under color of state law of the constructional right to be free from any deprivation of liberty without due process of law und under the Fourth and Fourteenth Amendment to the United States Constitution.

333. That the City of New York through its Department of Correction had constructive notice of an unconstitutional  pattern of inmates being held in Rikers Island on $1 bail without the inmates knowledge  and failed to do any training or supervision to rectify the  problem during the period of Salem' incarceration.

334. That the decisions by the Wardens and Tour Commanders, and Captains at Rikers Island and other municipal employees to ignore court orders to release Aitabdellah Salem constituted an adoption of official policy and is attributable to the City of New York.

335. That the failure of the City of New York, and the New York City Department of Correction Commissioner Joseph Ponte to adequately train, supervise or discipline or in any other way control the behavior of the municipal defendants identified herein in the exercise of their official functions and their failure to enforce the laws of the State of New York, and the regulations of the City of  New York Department of Correction, is evidence of the reckless lack of cautious disregard for the rights of the plaintiff, Aitabdellah Salem.

336. That such conduct, or lack thereof exhibited a lack of the degree of due care which a reasonable  and  prudent  individual  would  have  shown  in  executing  the  duties  of  the Commissioner of the New York City Department of Correction.

337. That the failure of the City of New York and the Commissioner of the New York City Department of Correction to adequately train, supervise, discipline or in any other way to control the defendants in the exercise of their official functions, including the expeditious compliance with Court orders to immediate release pretrial detainees, and to produce such detainees in Court as order by such Court, including and extending to the failure to communicate to such detainees decisions of the Court made in the detainees absence, and their failure to enforce the laws of the State of New York, and the regulations of the City of New York Department of Correction, constituted deliberated indifference to Salem's constitutional rights and was the proximate cause of the plaintiff's injuries.

338. The need for more or better supervision, or training to protect against the constitutional violation was patently obvious which the City of New York failed to provide.

339. That upon information and belief, at all times relevant herein, the individual Defendants intentionally, willfully, maliciously, negligently, and deliberately acted with reckless disregard for Plaintiff's constitutional rights and deliberately failed to followed the procedures set forth herein which caused Salem to be held in custody beyond his Court ordered release date on November 28, 2014, and again on January 21, 2015.

340. That at all times relevant herein, the individual Defendants acted intentionally, willfully maliciously, negligently, deliberately, and with reckless disregard to an order from the Criminal Court to produce Plaintiff in court on February 21, 2015, in civilian clothes so that he could be released from custody.

341. The actions of the individual Defendants, as set forth herein , were the result of the failure of the City of New York Department of Correction to properly train, supervise and discipline its employees including the individually named Defendants in complying with Plaintiffs right to be

produced in Court, and his right to be notified that his bail had been reduced from $ 50,000 to $ 1.00, as well as his right to be free from custody once the conditions which original held him were no longer in force.

342. The failure to train, supervise, and discipline, and failure to investigate its municipal employees misconduct demonstrated a deliberate indifference on behalf of the City of New York towards the Plaintiff and other inmates similarly situation in Rikers Island, and throughout the Department of Correction.

343. That upon information, and belief, the New York City Department of Correction allowed correction officers that were injured on duty, and prohibited from working with or near inmates, to work in the General office where they received no substantive training in the General Office Manual regarding the production of inmates to court, securing orders, changes in inmates status, or processing the release of inmates upon court order.

344.  That the practice by the D.O.C. of allowing those correction officers injured on duty to work in the general office without formal training was widespread to constitute a custom and practice at Rikers Island which was known and tolerated by the administrators, policy makers, supervisors, and the Defendants.

345.  That the need for better training, and better supervision was so obvious and so likely to result in the violation of inmates constitutional rights that the policymakers of the City of New York can reasonably be said to have been deliberately indifferent to the need.

346. That there is a direct causal link between Salem's deprivation of liberty and the inadequate training, supervision, and failure to discipline the D.O.C. employees in failing to comply with D.O.C. procedures set forth in the General Office Manuel.

347. That at all times relevant herein, Defendant City of New York, acting through its Department of Correction, developed , implemented , enforced, encouraged, and sanctioned de facto policies, practices, and or customs exhibiting deliberate indifference to the Plaintiff's constitutional right to be free from capricious and arbitrary restrictions on his liberty.

348. That the Defendants' unlawful actions were done willfully, knowingly and with the specific intent to deprive Plaintiff of his constitutional rights under the Fourth and Fourteenth Amendments to the Constitution of the United States.

349. The constitutional abuses and violations by the City of New York through the actions of its New York City Department of Correction, and Defendants Joseph Ponte, John Doe no.1, Warden of the  New  York City Department of Correction, John Doe no. 2, assistant warden, John Doe No.3, Tour Commander, of the AMKC, Correctional Facility at Rikers Island, and John Doe No. 4, Captain, AMKC , Rikers Island, and other municipal employees, were  directly, and proximately caused by policies, practices and or customs developed ,implemented, enforced, encouraged and sanctioned by Defendant City of New York.

350. The failure of the New York City Department of Correction to comply with Court orders pertaining to the release of inmates without legal justification, or probable cause, was done willfully, knowingly and with deliberate indifference to Plaintiff's constitutional rights.

351. That the City administrators, policymakers, supervisors, and employees caused the unjustified over detention of Mr. Salam by their deliberate indifference to the risk of constitutional injury to the Plaintiff being over detained

352. That the City of New York failed to respond to an obvious need for training of its employees in complying with Court orders, and with court orders to produce inmates to Court and with procedures in changing the detention status of inmates and the change in the status of

an inmate's amount of bail in such a manner that the City of New York manifested deliberate indifference to the risk of that not addressing the need would result in the constitutional violation of Plaintiff's rights.

353.   The failure to train and supervise the municipal employees in the general office in procedures involved in timely processing court orders which change the bail status of detainees and releasing and discharging detainees caused a pattern a and practice of the inmates to be held in custody beyond their court ordered release dates in violation of due process of law.

**SINGLE THEORY LIABILITY**

354.   In addition,  Plaintiff claims that his incarnation of one hundred thirty eight days and the over detention other pretrial detainees beyond their court ordered release dates, violated Salem and hundreds of other pretrial detainees' constitutional right to be free from the deprivation of liberty without due process of law.

355.   That based on the failure to train and willful lack of supervision in the described procedures contained in paragraphs 70-224, the violation of Salem' right to be free from the deprivation of liberty was a predictable consequence of the failure by the Defendants at the DOC to supervise the municipal employees and correction officers in the general office.

356.   In addition, the likelihood of recurrence of the situation described herein including changes in the bail status of Mr. Salem and hundreds of other pretrial detainees and the release and discharge procedures and the predictability of the constitutional rights of Salem and other pretrial detainees of being held in custody on bail of one dollar without being informed that the bail status had changed, justifies a finding by this court that the policymakers, Commissioner Ponte, the Warden, Assistant Warden, Tour Commanders and Captains were all deliberately indifferent to Salem's' constitutional rights.

357.  As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

**FOURTH CLAIM FOR RELIEF**

**AGAINST ALL DEFENDANTS UNDER 42 U.S.C SECTION 1983 ON BEHALF OF THE PLAINTIFF FOR UNREASONABLE SEIZURE UNDER THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES**

358.  That Plaintiff repeats, reiterates, and realleges each and every allegation contained in Paragraphs "1 through "357", with the same force and effect as though more fully set forth at length herein.

359. On January 15, 2015, Judge Mennin ordered the Defendant to produce Salem to court in civilian clothes, on January 21, 2014, obviously for his immediate release from court.

360. The DOC brought Salem to the court house on January 21, 2015, and left in the court's holding cell, not in civilian clothes but in his prison clothes in deliberate defiance of Judge Mennin's order.

361.  Salem was unaware the he should have been brought to the courthouse in his civilian clothes.

362.  Salem was brought back to Rikers Island.

363.  On February 11, 2015, Mr. Salem was taken to his scheduled court appearance where again he remained unaware the he should have been free from custody on November 28, 2014, and again on January 21, 2015. Salem was not produced in court.

364.  Salem was taken back to Rikers Island on February 11, 2015, where he remained until April 15, 2015 without legal justification.

365.  Thus, Salem was seized without legal justification.

366. That at all times herein mentioned the plaintiff, was wrongfully seized, detained, restrained and held in custody from November 28, 2014, through April 15, 2015.

367. That at all times herein mentioned, the defendants intended to confine the plaintiff without privilege, and the plaintiff was conscious of the confinement and did not consent to the confinement.

368. Mr. Salem was conscious of the seizure and did not consent.

369. Mr. Salem's claim of unreasonable seizure is based on the fact that he was ordered brought to court in civilian clothes at which point he was to be released and treated as free citizen protected by the Fourth Amendment.

370. The Department of Correction willfully ignored the court order requiring Salem's appearance in court in civilian clothes. Salem was sent back to prison and treated as though his guilt had been adjudicated in furtherance of its policy and practice of deliberate indifference to Salem's constitutional rights.

371. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." **Bell v. Wolfish**, 441 U.S. 520, 559, 99 S. Ct. 1861, 60 L. Ed. 2d. 447 (1979).

372. The Fourth Amendment reasonableness standard is inherently fact dependent.

373. As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

**WHEREFORE,** Plaintiff requests that this Court grant the following relief jointly and severally against the Defendants:

A. Compensatory damages in the amount this Court shall consider to be fair, reasonable and just to be determined at trial for the unlawful incarceration and restraint of liberty as well as

the pain, suffering and psychological injuries sustained by Mr. Salem as a result of the events alleged herein.

B. Punitive damages against the individual Defendants and supervisory Defendants in an amount to be determined at trial.

C.  An order awarding Plaintiff reasonable attorneys' fees under 42.U.S.C Section 1988, together with the costs of this action.

D.  Such other and further relief as the Court may deem just and proper.

Dated:  September 6, 2018
          Bronx, New York

By /s/_____
Welton K. Wisham, Esq, (WW8674)
The Law Office of Welton K. Wisham
1200 Waters Place, Suite 105
Bronx, New York 10461
(718) 924-3557 Office
(718) 678-8062 Fax
Attorney for the Plaintiff